IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CARDIONET, LLC, et al. | : | CIVIL ACTION |
| | : | |
| v. | : | No. 12-2517 |
| | : | |
| MEDNET HEALTHCARE | : | |
| TECHNOLOGIES, INC., et al. | : | |

## MEMORANDUM

**Juan R. Sánchez, J.**                                                    **November 23, 2015**

Plaintiffs CardioNet, LLC and Braemar Manufacturing, LLC (collectively, CardioNet)

ask this Court to find Defendant MedTel24, Inc. (MedTel) in contempt of the January 31, 2014,

Consent Judgment by which the parties agreed to resolve this patent infringement action and to

impose appropriate contempt sanctions.  CardioNet also asks the Court to impose sanctions on

MedTel and its counsel for making false statements and frivolous arguments in its motions for

relief from, and to stay enforcement of, the Consent Judgment, which this Court denied on July

22, 2015.  This Court heard argument on the motions on May 7, 2015, and held a contempt

hearing on September 21 and 29, 2015.  On October 2, 2015, the Court issued an Order finding

MedTel in contempt of ¶ 16 of the Consent Judgment and directing MedTel to comply with its

obligations under that provision within 21 days.  The Court reserved ruling on whether MedTel

is also in contempt of ¶¶ 14 and 19 of the Consent Judgment and CardioNet's request for

damages.  The Court issues this Memorandum to address these issues as well as CardioNet's

motion for sanctions.

Upon consideration of the arguments and evidence presented by the parties in their

written submissions, at the oral argument, and at the contempt hearing, and for the reasons set

forth below, the Court finds CardioNet has proved by clear and convincing evidence that MedTel

is in contempt of ¶ 14 as well as ¶ 16 of the Consent Judgment, and will award CardioNet

damages for lost profits and attorneys' fees and costs as set forth herein.  CardioNet's motion for sanctions will be denied.

**FACTS**

In the underlying patent infringement action, CardioNet sued Mednet Healthcare Technologies (Mednet), three companies affiliated with Mednet,[1] and three customers of Mednet, including MedTel,[2] alleging Defendants were infringing five patents owned by CardioNet by making, using, selling, and/or offering for sale the Heartrak ECAT System, a cardiac monitoring system used to monitor, analyze, and report patient cardiac activity during a period prescribed by the patient's physician.  The Heartrak ECAT System consists primarily of two devices—a Monitor and a Communicator—and software, known as CardioStation, which is configured to operate at a monitoring center in conjunction with the devices.  *See* Defs.' Pretrial Mem. 12, ECF No. 239; *see also* Consent J. ¶ 13 (defining the Heartrak ECAT System as including a Monitor, a Communicator, and CardioStation or eCardioStation software).  The Monitor is carried by the patient and is used to acquire data about the patient's cardiac activity during the monitoring period.  *See* Defs.' Pretrial Mem. 12; Finkelmeier Decl. ¶ 6, ECF No. 274-2.  The Communicator is also carried by the patient and is used to receive data regarding the patient's cardiac activity from the Monitor and transmit the data to a monitoring center through cellular networks.  *See* Defs.' Pretrial Mem. 12; Finkelmeier Decl. ¶ 6.  The software is used to process signals received from the Monitor and Communicator so that a report can be provided to

---

[1] The Mednet-affiliated companies named as Defendants are Universal Medical, Inc. (UMI), HeartCare Corporation of America (HeartCare), and Universal Medical Laboratory, Inc. (UML).

[2] The other two customer Defendants are RhythmWatch LLC (RhythmWatch) and AMI Cardiac Monitoring (AMI).

the patient's physician.  *See* Contempt Hr'g Tr. 108, 224, Sept. 21, 2015 (hereinafter "Contempt Hr'g Tr. I"); Alima Dep. 14, 18-19.

MedTel is in the business of "remote cardiac monitoring."  MedTel's Opp'n to Pls.' Contempt Mot. 2.  Prior to the entry of the Consent Judgment, MedTel's business included selling Heartrak ECAT devices (Monitors and Communicators) to physicians and providing monitoring services for those devices.[3]  *See* Contempt Hr'g Tr. I 223-24.  Under an October 2011 Purchase, Resale and License Agreement (License Agreement) with UMI, a Mednet-affiliated company, MedTel purchased Heartrak ECAT devices from UMI and resold the devices to physicians who then entered into monitoring services agreements with MedTel.  *See* DX-13 (hereinafter "License Agreement") 1 & Ex. A; PX-26 (sample monitoring services agreement); Contempt Hr'g Tr. I 108-09.  MedTel also licensed CardioStation software from UMI for use in connection with the devices.[4]  *See* License Agreement 5 & Ex. B.  Using the CardioStation software, MedTel provided monitoring services to physicians pursuant to the monitoring services agreements, earning revenue from the monitoring on a fee-for-service basis.[5]  *See* Contempt Hr'g

---

[3] MedTel also sold and provided monitoring services associated with another device, the Heartrak Smart Wireless event monitor, which is not at issue in this case.  *See* Contempt Hr'g Tr. I 225-29; MedTel's Hr'g Ex. DX-1, at 4 (2012 business plan describing MedTel's primary products as the Smart Wireless device and the ECAT device).  The same CardioStation software used to process data from the Heartrak ECAT device is also used to provide monitoring services for the Heartrak Smart Wireless device.  *See* Contempt Hr'g Tr. I 226, 229, 258.  MedTel has sold more Heartrak Smart Wireless devices than Heartrak ECAT devices by a ratio of two and a half or three to one.  *See id.* at 227, 308.  MedTel's revenue from ECAT monitoring, however, was approximately three times its revenue from Smart Wireless monitoring.  *See id.* at 308.

[4] An August 2013 amendment to the License Agreement provides MedTel's license "shall be expanded to a full transfer of rights and ownership (non-exclusive) of all the software contemplated by the Agreement."  License Agreement, Amendment.

[5] MedTel's business model, wherein MedTel would sell Heartrak ECAT devices to physicians and then provide monitoring services for which it would bill the physician on a fee-for-service basis, is known as the physician purchase model.  *See* Contempt Hr'g Tr. I 97; Contempt Hr'g

Tr. I 118, 160, 221; DX-1 at 6.  According to Lee Sanders, MedTel's CEO, in 2012, MedTel's first year of operations, sales of ECAT devices accounted for 40% of MedTel's net profits.  *See* Contempt Hr'g Tr. I 180-81, 235.  These devices then became a source of ongoing monitoring revenue for MedTel.  *See id.* at 224.  Although MedTel functioned as both a seller of Heartrak ECAT devices and a provider of monitoring services for the devices, the Complaint in this action singled out the company's role as a monitoring services provider.  *See* Compl. ¶¶ 13, 19-21, 30.

On January 31, 2014, days before the February 3, 2014, trial date, the parties agreed to settle this action and presented this Court with a fully executed Consent Judgment, which the Court signed the same day.  In ¶ 13 of the Consent Judgment, the parties agreed "[m]aking, using, offering to sell or selling in the United States of the accused Heartrak ECAT System, including (i) a Heartrak ECAT Monitor, (ii) a Heartrak ECAT Communicator; and (iii)

---

Tr. 6-7, Sept. 29, 2105 (hereinafter "Contempt Hr'g Tr. II").  The other main business model in the remote cardiac monitoring industry is the traditional model, in which the provider operates as an independent diagnostic testing facility (IDTF), providing all the services necessary for a patient to complete a cardiac monitoring session.  *See* Contempt Hr'g Tr. II 5-6.  MedTel promoted the physician purchase model to its customer physicians as allowing the physician to capture a greater portion of the overall monitoring revenue as compared with the traditional model.  *See* Contempt Hr'g Tr. I 232-33; MedTel's Hr'g Ex. DX-3 (MedTel marketing materials contrasting a physician's revenues from monitoring under the traditional model and MedTel's physician purchase model).  Under the traditional model, the IDTF receives most of the payment for monitoring services (approximately $759 on average, according to MedTel), and the physician receives only a modest fee (on the order of $28) for reviewing the information generated as a result of the monitoring.  *See* Contempt Hr'g Tr. I 231, 233; MedTel's Hr'g Ex. DX-3.  Under the physician purchase model, in contrast, the monitoring fee is paid to the physician, who pays a lesser fee (approximately $300, by MedTel's account) to the monitoring service provider.  *See* Contempt Hr'g Tr. I 231, 233.  Although the physician purchase model offers the physician the possibility of capturing a greater portion of the monitoring revenue, the model requires an initial outlay of money to purchase the devices and requires the physician to assume the risk of maintenance and loss for the devices and the burdens associated with billing insurance companies and collecting payment.  *See* Contempt Hr'g Tr. II 6, 9-10.  Under the traditional model, the IDTF assumes all risks associated with providing monitoring services.  *See id.* at 6, 8.  CardioNet offers both the physician purchase model and the traditional model to customers, but the vast majority of its business is from the traditional model.  *See id.* at 10; *see also* Contempt Hr'g Tr. I 94-95.

CardioStation or eCardiostation software infringes [the five CardioNet patents at issue in the case].ʺ[6]  Consent J. ¶ 13.  The Consent Judgment goes on, in ¶ 14, to "permanently enjoin[] and restrain[]" all Defendants, including MedTel, "from infringing, contributorily infringing or inducing the infringement of the Patents in Suit," except as licensed or otherwise agreed to by the parties.  *Id.* ¶ 14.  While ¶ 16 of the Consent Judgment grants MedTel and the other customer Defendants (i.e., RhythmWatch and AMI) "a limited, non-exclusive license to make, use, sell or offer for sale, the Heartrak ECAT System in the United States for a period of one (1) year from the date of this Consent Judgment," it provides that "[t]hereafter, all inventories of the Heartrak ECAT System in the United States belonging to or held by Medtel24[7] . . . , *including all related software/source code, including CardioStation and eCardioStation*, hardware, including the Heartrak ECAT Monitor and Communicator, and documentation shall be delivered, at Medtel24's . . . expense[], to Plaintiffs . . . to be received by Plaintiffs no later than 15 days after the one year date."  *Id.* ¶ 16 (emphasis added).  Finally, ¶ 19 of the Consent Judgment prohibits all Defendants from

> transfer[ring], assign[ing], sell[ing] or otherwise disclos[ing] or mak[ing] available to any third party any inventory or materials belonging to or held by them relating to the Heartrak ECAT System, including all related software/source code, CardioStation, eCardioStation, hardware, including the Heartrak ECAT Monitor and Communicator, and documentation, outside the scope of their

---

[6] Paragraph 13 also provides that "[e]ach of the Mednet Defendants," i.e., Mednet, HeartCare, UMI, and UML, "has infringed the Patents in Suit by making, using, offering to sell or selling within the United States the Heartrak ECAT System."  Consent J. ¶ 13.  Paragraph 13 does not include an explicit concession of past infringement by MedTel, which is not one of the "Mednet Defendants."  *See id.* ¶ 14(a), (b) (defining "MedTel24" separately from the "Mednet Defendants").

[7] The Consent Judgment refers to MedTel as "Medtel 24, Inc.," "Medtel24, Inc.," and "MedTel24, Inc."  When quoting the Consent Judgment, the Court has used the version that appears in the quoted portion.

conventional activities as cardiac monitoring service providers, without obtaining prior written permission from CardioNet and Braemar.

*Id.* ¶ 19.

After the Consent Judgment was entered, MedTel continued to sell Heartrak ECAT devices to physicians to some extent[8] and continued to provide monitoring services for such devices using CardioStation software during the one-year license period contemplated by ¶ 16 of the Consent Judgment. *See* Contempt Hr'g Tr. I 38-39, 124. MedTel also sought to negotiate an extension of the one-year license period with CardioNet. *See id.* at 138. Toward that end, Mr. Sanders, MedTel's CEO, had some 33 different conversations and email or text message exchanges with Joseph Capper, CardioNet's CEO.[9] *See* Contempt Hr'g Tr. I 138-39. Mr. Sanders explained an extension was necessary because one year was not enough time for MedTel to "develop a new product" so as to be able to "complete the transfer of [MedTel's] many accounts to new technology." Pls.' Hr'g Ex. PX-10, at 1-2. Although CardioNet eventually offered MedTel a three-month extension of the license period, MedTel did not accept the offer. *See* Contempt Hr'g Tr. I 61, 64-65.

During the one-year license period, MedTel also contracted with a software engineering firm in Israel to advise the company on "how to build [its] own software" and/or to modify or

---

[8] The extent to which MedTel continued to sell Heartrak ECAT devices during the one-year license period is not clear. Mr. Sanders testified that MedTel "formally" stopped selling devices on January 31, 2015, but "functionally . . . stopped prior to that." Contempt Hr'g Tr. I 230.

[9] Mr. Sanders had previously negotiated the length of the license period with Mr. Capper prior to agreeing to the Consent Judgment in January 2014. As a result of those negotiations, Mr. Capper agreed to extend the license period from three months to the one year reflected in the Consent Judgment. *See* Contempt Hr'g Tr. I 58. Mr. Sanders had wanted a two-year license period, but CardioNet would not agree. *See id.* Mr. Sanders maintains Mr. Capper promised he would work out an extension for MedTel at a later time; Mr. Capper denies having promised Mr. Sanders anything. *See* Pls.' Hr'g Ex. PX-8.

enhance the CardioStation software.  *Id.* at 271; *see also* Alima Dep. 115 (explaining MedTel hired the Israeli company to find an alternative to the CardioStation software for MedTel's monitoring).  In connection with the Israeli company's work for MedTel, MedTel gave the company access to its system, including the CardioStation software, and the company reviewed the source code for the software.  *See* Alima Dep. 116-17.[10]

On January 30, 2015, the day before the one-year license period was to expire, MedTel, having failed to obtain an extension of the license period, filed a motion for relief from the Consent Judgment pursuant to Federal Rule of Civil Procedure 60(b), asserting the Judgment should be set aside because MedTel was not represented by counsel when the Judgment was entered, accepted the Judgment under duress, and was precluded from presenting a full and fair defense at trial due to its counsel's failure to timely disclose a conflict of interest.  The same day, MedTel commenced an arbitration against CardioNet, as UMI's successor and/or assignee under the License Agreement, based on CardioNet's alleged breaches of the License Agreement.[11]  A week later, on February 6, 2015, CardioNet filed the instant motion for a finding of contempt and appropriate sanctions, alleging MedTel was violating the Consent Judgment by continuing to use the Heartrak ECAT System after the end of the one-year license period.  In support of its allegations regarding MedTel's continued use, CardioNet produced evidence suggesting MedTel was continuing to monitor Heartrak ECAT devices it had previously sold, including evidence that wireless accounts associated with devices placed in the field by MedTel were still being

---

[10] According to Mr. Sanders, in addition to advising MedTel about building its own software or modifying the CardioStation software, the Israeli company also provided "generic support and maintenance activities" for MedTel because MedTel was not "getting a whole lot of support . . . from Mednet's engineers" at the time.  Contempt Hr'g Tr. I 271-72, 306.

[11] Also the same day, CardioNet acquired Mednet, UMI, HeartCare, and UML pursuant to a Stock Purchase Agreement.

actively used as of February 4, 2015,[12] and evidence that MedTel was continuing to submit repair requests for previously sold Heartrak ECAT devices and to place orders for Heartrak ECAT parts.  *See generally* Finkelmeier Decl., ECF No. 274-2.

MedTel thereafter filed a motion to stay enforcement of the Consent Judgment pending resolution of its motion for relief from that Judgment and completion of the arbitration. CardioNet, in turn, moved to stay the arbitration pending the Court's ruling on the validity and enforceability of the Consent Judgment.  CardioNet later filed a motion for sanctions against MedTel and its counsel pursuant to Federal Rule of Civil Procedure 11, 28 U.S.C. § 1927, and the Court's inherent powers based on MedTel's filing of the motion for relief and motion to stay. Following an oral argument on all pending motions on May 7, 2015, the Court denied MedTel's motions for relief from the Consent Judgment and to stay enforcement of the Consent Judgment and denied without prejudice CardioNet's motion to stay the arbitration on July 22, 2015.  On

---

[12] The Heartrak ECAT System uses cellular technology to transmit data collected by a Heartrak ECAT Monitor to a monitoring center for processing.  *See* Finkelmeier Decl. ¶ 6.  Each Heartrak ECAT Monitor is associated with its own cellular account.  *See id.*  Prior to CardioNet's acquisition of Mednet and UMI, Mednet/UMI maintained the AT&T wireless accounts associated with the Heartrak ECAT devices sold by MedTel and billed MedTel for the fees on those accounts.  *See* Contempt Hr'g Tr. I 161-63.  Upon acquiring Mednet and UMI, CardioNet became the owner of the AT&T wireless accounts and was therefore able to determine that the accounts were still being used after the end of the license period.  *See* Finkelmeier Decl. ¶¶ 4, 8.

At some point in 2013 or 2014, MedTel requested Mednet/UMI to transfer the wireless accounts to MedTel, but Mednet/UMI and/or CardioNet failed to do so.  *See* Contempt Hr'g Tr. I 184.  Whether the failure to transfer the accounts constitutes a breach of the License Agreement is one of the issues raised by MedTel in the arbitration.  *See* MedTel's Supplemental Statement of Claims & Relief Requested 5-6, ECF No. 360-3.  On February 3, 2015, MedTel notified CardioNet it was suspending performance of its payment obligations under the License Agreement pending resolution of the arbitration.  *See* Pls.' Hr'g Ex. PX-13.  In addition, beginning as early as April 2015, MedTel began instructing its customers to replace the SIM cards in their devices so as to transition the devices to new wireless accounts controlled by MedTel.  *See* Contempt Hr'g Tr. I 166.  CardioNet nevertheless continued to maintain the AT&T wireless accounts associated with the Heartrak ECAT devices sold by MedTel until shortly after July 22, 2015, the date this Court denied MedTel's motion for relief from the Consent Judgment. *See id.* at 79-80.

August 19, 2015, the Court issued an order to show cause granting CardioNet's request for discovery on the issue of contempt and scheduling a contempt hearing for September 21 and 22, 2015.  At MedTel's request, the second day of the hearing was later rescheduled to September 29, 2015.[13]

At the contempt hearing, MedTel conceded that while it had not sold any Heartrak ECAT devices following the expiration of the one-year license period on January 31, 2015, it continued to provide monitoring services for previously sold devices using CardioStation software.  *See* Contempt Hr'g Tr. I 118, 124-26, 155, 230.  MedTel provided these monitoring services pursuant to the same monitoring services agreements it entered with the physicians when they purchased the Heartrak ECAT devices.  *See id.* at 118.  Indeed, MedTel admitted it was doing nothing different with respect to the provision of monitoring services for Heartrak ECAT devices at the time of the hearing from what it was doing before the Consent Judgment was entered.  *See*

---

[13] After the order to show cause was issued, MedTel filed a notice of appeal from the Court's denial of its motion for relief from the Consent Judgment.  Neither party has suggested the pendency of this appeal divests this Court of jurisdiction over the instant contempt and sanctions motions.  Having independently considered the issue, the Court is satisfied it retains jurisdiction to enforce the Consent Judgment and to rule on the pending sanctions motion, notwithstanding MedTel's appeal.  *See In re Schaefer Salt Recovery, Inc.*, 542 F.3d 90, 98 (3d Cir. 2008) ("It is well established . . . that a district court, after the entry of final judgment and the filing of a notice of appeal, retains the power to adjudicate collateral matters such as sanctions under Rule 11."); *Chao v. Koresko*, No. 04-3614, 2005 WL 2521886, at *5 (3d Cir. 2005) (holding the filing of a notice of appeal does not divest a district court of authority to enforce a judgment that has not been stayed (citing 20 James Wm. Moore et al., *Moore's Federal Practice* ¶ 303.32[2][c][vi])); *see also Chaganti & Assocs., P.C. v. Nowotny*, 470 F.3d 1215, 1223 (8th Cir. 2006) (holding absent a stay of a district court's judgment, the district court retains jurisdiction to enforce the judgment notwithstanding a party's appeal on the merits); *Santibanez v. Wier McMahon & Co.*, 105 F.3d 234, 238 (5th Cir. 1997) ("A district court has continuing jurisdiction in support of its judgment, and [u]ntil the judgment has been properly stayed or superseded, the district court may enforce it through contempt sanctions." (alteration in original) (citation and internal quotation marks omitted)).

*id.* at 125.  Between February 1, 2015, and August 15, 2015, MedTel billed physicians for 2,658 ECAT monitoring sessions.  *See* Pls.' Hr'g Ex. PX-14.

MedTel also admitted it continued to possess multiple copies of the CardioStation software, *id.* at 126-28; *see also id.* at 137; Alima Dep. 18, and may have given a damaged ECAT Monitor to its counsel for safekeeping, *see* Contempt Hr'g Tr. I 129-30.  It is undisputed that, as of the date of the contempt hearing, MedTel had not delivered these materials, or any documentation it possessed regarding the Heartrak ECAT System, to CardioNet.  *Id.* at 31, 125-26, 128.  In fact, MedTel admitted it had no intention of stopping its ongoing use of the CardioStation software unless directed to do so by the Court.  *Id.* at 126.

On October 2, 2015, this Court issued an Order finding MedTel in contempt of ¶ 16 of the Consent Judgment and directing MedTel to comply with its obligations under that paragraph by delivering the materials specified therein, including all software, source code, and documentation related to the Heartrak ECAT System, to CardioNet within 21 days.[14]  The Court reserved ruling on whether MedTel was also in contempt of ¶¶ 14 and 19 of the Consent Judgment and on CardioNet's request for damages.

---

[14] MedTel filed a notice of appeal from the October 2, 2015, Order on October 16, 2015, and sought a stay of the Order pending appeal, which the Federal Circuit denied on October 19, 2015.  On October 23, 2015, Mr. Sanders submitted a declaration of compliance with the October 2, 2015, Order, swearing, under penalty of perjury, that MedTel "delivered today to CardioNet all of the materials identified in Paragraph 16 of the Consent Judgment, including, but not limited to, all software/source code related to the Heartrak ECAT System, including CardioStation and eCardioStation, and all documentation related to the Heartrak ECAT System." Decl. of Compliance, ECF No. 387-1.

## DISCUSSION

### A.     Contempt

District courts "have inherent power to enforce compliance with their lawful orders through civil contempt."  *Shillitani v. United States*, 384 U.S. 364, 370 (1966).  A consent judgment, "although negotiated by the parties, is a judicial act" enforceable by exercise of "the powers by which a court protects its judgments, including most notably the power of contempt." *Interdynamics, Inc. v. Firma Wolf*, 653 F.2d 93, 96-97 (3d Cir. 1981).  In this case, moreover, the Consent Judgment explicitly provides that this Court "shall retain continuing jurisdiction over this action for the purpose of enforcing the terms of this Consent Judgment."  Consent J. ¶ 22.

To prove civil contempt, a movant must establish, by clear and convincing evidence, "(1) that a valid order of the court existed; (2) that the defendant[] had knowledge of the order; and (3) that the defendant[] disobeyed the order."  *Marshak v. Treadwell*, 595 F.3d 478, 485 (3d Cir. 2009) (citation and internal quotation marks omitted); *see also John T. ex rel. Paul T. v. Del. Cnty. Intermediate Unit*, 318 F.3d 545, 552 (3d Cir. 2003).[15]  To be enforceable by contempt, the order in question must be "specific and definite."  *Harris v. City of Phila.*, 47 F.3d 1342, 1350 (3d Cir. 1995) (citation omitted).  "[W]here there is ground to doubt the wrongfulness of the conduct, [the defendant] should not be adjudged in contempt."  *Robin Woods Inc. v. Woods*, 28 F.3d 396, 399 (3d Cir. 1994) (citation and internal quotation marks omitted); *accord TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869, 888 n.8 (Fed. Cir. 2011) (suggesting "contempt can be disfavored where the party had no notice that the decree barred the alleged conduct").  Willfulness,

---

[15] "Regional circuit law governs contempt proceedings that do not raise issues unique to patent law."  *Energy Recovery, Inc. v. Hauge*, 745 F.3d 1353, 1356 (Fed. Cir. 2014) (citation omitted). Interpretation of a consent judgment is generally "not an issue unique to patent law, even if arising in the context of a patent infringement suit."  *Novamedix, Ltd. v. NDM Acquisition Corp.*, 166 F.3d 1177, 1180 (Fed. Cir. 1999).

however, "is not a necessary element of civil contempt"; hence, evidence that the defendant acted in good faith does not bar a finding of contempt.  *Harley-Davidson, Inc. v. Morris*, 19 F.3d 142, 148-49 (3d Cir. 1994); *see also Robin Woods*, 28 F.3d at 399.

For purposes of enforcement, a court must interpret a consent judgment "as a contract, to which the governing rules of contract interpretation apply," and must "discern the scope of [the] consent judgment by review of what is within the four corners of the consent, not by reference to 'what might satisfy the purposes of one of the parties to it.'"  *Harley-Davidson*, 19 F.3d at 148 (quoting *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 574 (1984)); *see also Diversey Lever, Inc. v. Ecolab, Inc.*, 191 F.3d 1350, 1352 (Fed. Cir. 1999) ("[T]he scope of a consent decree is limited to its terms and . . . its meaning should not be strained." (alteration in original) (citation omitted)).  The court must attempt to construe the judgment "so as to give meaning to all of its words and phrases," *Halderman v. Pennhurst State Sch. & Hosp.*, 901 F.2d 311, 318 (3d Cir. 1990), and must interpret the language used by the parties "in accordance with its generally prevailing meaning unless the parties manifest a different intention or the words are technical," *Fox v. U.S. Dep't of Hous. & Urban Dev.*, 680 F.2d 315, 320 (3d Cir. 1982).

The first two contempt elements are easily satisfied here.  The Consent Judgment, which this Court signed on January 31, 2014, is a valid court order.  Although MedTel sought relief from the Consent Judgment via a Rule 60(b) motion, the Court denied MedTel's motion.  The pendency of MedTel's appeal of that ruling does not affect the validity of the Consent Judgment for purposes of this contempt proceeding.  *See Santibanez v. Wier McMahon & Co.*, 105 F.3d 234, 238 (5th Cir. 1997) (holding "[u]ntil [a] judgment has been properly stayed or superseded, the district court may enforce it through contempt sanctions" (first alteration in original) (citation omitted)).  Moreover, MedTel admittedly had knowledge of the Consent Judgment.  *See, e.g.*,

12

Contempt Hr'g Tr. I 124 (admission by Sanders that he reread the Consent Judgment in connection with MedTel's decision to stay in business after the expiration of the license period).

As to the third element, CardioNet argues MedTel has disobeyed the Consent Judgment in three ways. First, CardioNet argues MedTel has violated the permanent injunction against "infringing, contributorily infringing or inducing the infringement of the Patents in Suit" in ¶ 14 of the Consent Judgment because it has continued to use the Heartrak ECAT System by providing monitoring services for Heartrak ECAT devices. Second, CardioNet argues MedTel has violated ¶ 16 of the Consent Judgment by continuing to possess multiple copies of the CardioStation software and at least some source code for the software, which it was required to deliver to CardioNet in February 2015. Third, CardioNet maintains MedTel violated ¶ 19 of the Consent Judgment by giving a third party access to CardioStation software and source code on MedTel's server without first obtaining CardioNet's written permission.[16]

---

[16] As a preliminary matter, MedTel argues CardioNet should not be permitted to enforce the Consent Judgment because CardioNet has unclean hands as a result of a pattern of "bad acts" toward MedTel. Such bad acts include, for example, CardioNet's failure to provide MedTel with the complete source code for the CardioStation software, to which MedTel claims it was entitled under the Amendment to the License Agreement, thereby preventing MedTel from designing around CardioNet's patents. MedTel also accuses CardioNet of, inter alia, exercising "deceptive and secret influence" on Mednet/UMI prior to the pretrial hearing in this case, inducing MedTel to agree to the Consent Judgment through misrepresentations, failing to honor an alleged oral agreement to extend the term of the Consent Judgment, attempting "collusion to fix prices," disparaging MedTel to its customers, and failing to honor its indemnification obligations under the License Agreement. *See* MedTel's Opp'n to Pls.' Mot. for Contempt 12-13.

"To prevail on an unclean hands defense, the defendant must show fraud, unconscionability, or bad faith on the part of the plaintiff." *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 377 n.7 (3d Cir. 1992). MedTel has failed to make the required showing here. For example, while MedTel accuses CardioNet of failing to honor an alleged oral agreement concerning an extension of the license period in the Consent Judgment, MedTel has failed to present evidence showing such an agreement existed or was violated. In emails to Mr. Capper in December 2014 and January 2015, Mr. Sanders claimed that in January 2014, before the Consent Judgment was executed, Mr. Capper had promised to give MedTel "some sort of extension." Pls.' Hr'g Ex. PX-7; *see also* Pls.' Hr'g Ex. PX-10. MedTel presented no evidence at the contempt hearing about what, exactly, Mr. Capper allegedly agreed to, and Mr. Capper denied

1.      **Paragraph 14 Violation**

In ¶ 14 of the Consent Judgment, MedTel agreed to be permanently enjoined from *infringing* the Patents in Suit, a term defined in ¶ 13 to include "using . . . the accused Heartrak ECAT System, including (i) a Heartrak ECAT Monitor; (ii) a Heartrak ECAT Communicator; and (iii) CardioStation or eCardiostation software."  It is undisputed that, as of the time of the contempt hearing, MedTel continued to use the CardioStation software to provide monitoring services for Heartrak ECAT devices it previously sold, just as it did before the Consent Judgment was entered.  The question is whether the provision of such services constitutes use of the Heartrak ECAT System and thus infringement of the Patents in Suit enjoined by ¶ 14.

MedTel argues because ¶ 13 defines the Heartrak ECAT System as including three parts—a Monitor, a Communicator, and software—MedTel must use all three parts to be using the System.  MedTel maintains it uses only one part of the System—the CardioStation software—to provide monitoring services, while the remaining parts—the Monitors and Communicators—are used only by the physicians, who purchased those items from CardioNet,

---

making any promises.  *See* Pls.' Hr'g Ex. PX-8.  Moreover, Mr. Capper eventually did offer MedTel an extension of the license period, the terms of which are not in the record, but MedTel did not accept the offer.  Contempt Hr'g Tr. 64-65.

MedTel's allegations that CardioNet failed to provide MedTel with the source code for the CardioStation software likewise fall short of a showing of unclean hands.  The record reflects that MedTel requested the source code from Mednet/UMI and Biotelemetry, Inc., CardioNet's parent company, in January and February 2014, but did not receive it.  *See* Alima Aff. ¶ 3, ECF No. 308.  Although MedTel's claim to the source code derives from the License Agreement, there is no evidence MedTel sought to enforce its rights under that Agreement until January 2015, when it commenced arbitration against CardioNet under the Agreement the day before the Consent Judgment's one-year license period was set to expire.  Having taken no steps to enforce the Agreement for most of the duration of the one-year license period, when MedTel was actively looking to develop an alternative to CardioStation, MedTel cannot claim CardioNet's failure to disclose the source code eleven months earlier rises to the level of unclean hands. MedTel's remaining allegations of bad acts by CardioNet are little more than unsupported accusations.

and their patients.  In MedTel's view, because it does not use the Monitors or Communicators to provide monitoring services, the provision of such services does not constitute using the Heartrak ECAT System within the meaning of ¶ 13 and thus does not violate the injunction against infringing the Patents in Suit in ¶ 14.

CardioNet does not dispute the premise of MedTel's argument—that a party must use all three elements of the Heartrak ECAT System in order to use the System.  Rather, CardioNet takes issue with MedTel's contention that it does not use the Monitors and Communicators, arguing that, in fact, MedTel must use the Monitors and Communicators to provide monitoring services.[17]

The Court agrees with CardioNet that MedTel's provision of monitoring services for Heartrak ECAT devices constitutes using the Heartrak ECAT System within the meaning of the Consent Judgment.  The parties agree the term "use" should be interpreted according to its "plain meaning."[18]  *See* Contempt Hr'g Tr. II 106, 126.  The ordinary meaning of the term "use" is "to put into action or service: avail oneself of: EMPLOY."  *See Use*, *Merriam-Webster*, http://www.merriam-webster.com/dictionary/use (last visited Nov. 20, 2015).  MedTel admits that in providing monitoring services for Heartrak ECAT devices, it uses the CardioStation

---

[17] CardioNet initially argued MedTel uses the System to provide monitoring services, regardless of whether it utilizes all three components of the System, because at least some claims of the Patents in Suit do not require operation of all three portions of the System.  *See* Pls.' Reply in Supp. of Mot. for Contempt 1.  At the contempt hearing, however, CardioNet argued MedTel cannot use the software for Heartrak ECAT monitoring without also using the ECAT devices. *See* Contempt Hr'g Tr. I 14-17.

[18] Although the "[m]aking, using, offering to sell or selling" language in ¶ 13 of the Consent Judgment is drawn from 35 U.S.C. § 271(a), which defines patent infringement as the unauthorized "mak[ing], us[ing], offer[ing] to sell, or sell[ing] [of] any patented invention, within the United States," the parties do not argue "use" is a term of art for purposes of the Consent Judgment.

15

software to process data collected by a Heartrak ECAT Monitor and transmitted to MedTel's monitoring station via a Heartrak ECAT Communicator.  *See* Contempt Hr'g Tr. I 33-35, 108. As CardioNet notes, without a Monitor to collect patient data and a Communicator to transmit the data to MedTel, MedTel cannot use the software to provide monitoring services.  While MedTel does not own or physically possess the Monitors and Communicators, it must nevertheless employ those devices or put them into service in order to provide Heartrak ECAT monitoring services.[19]  Because MedTel must avail itself of a Heartrak ECAT Monitor and Communicator, as well as the CardioStation software, to provide monitoring services for Heartrak ECAT devices, the provision of such services constitutes use of the Heartrak ECAT System—and thus infringement of the Patents in Suit—within the meaning of ¶ 13 of the Consent Judgment, and MedTel's continued provision of monitoring services after the expiration of the one-year license period violates the permanent injunction against infringement in ¶ 14.[20]

---

[19]  Indeed, MedTel's standard monitoring services agreement specifically requires that the Monitors be "approved by MedTel24 to ensure that such monitors fully interact and sync with the monitoring software maintained by MedTel24."  Pls.' Hr'g Ex. PX-26, at MEDTEL-0002578.

[20]  At the contempt hearing, MedTel argued for the first time that the provision of monitoring services cannot constitute infringement because ¶ 19 of the Consent Judgment specifically authorizes it to continue to provide such services even after the expiration of the one-year license period in ¶ 16.  The Court disagrees.  Paragraph 19 prohibits the Defendants, including MedTel, from "transfer[ring], assign[ing], sell[ing] or otherwise disclos[ing] or mak[ing] available to any third party any inventory or materials belonging to or held by them relating to the Heartrak ECAT System . . . outside the scope of their conventional activities as cardiac monitoring service providers," without obtaining CardioNet's prior written permission.  Consent J. ¶ 19.  Because ¶ 19 prohibits disclosures of System-related materials only insofar as they are made "outside the scope of [Defendants'] conventional activities as cardiac monitoring service providers," *id.*, MedTel argues this provision "allow[s] [it] specifically to continue [its] monitoring service," Contempt Hr'g Tr. I 42; *see also id.* at 252-54.  Contrary to MedTel's assertion, however, nothing in ¶ 19 authorizes Defendants to provide such services.  Rather, this provision simply restricts the transfer, sale, or disclosure of System-related materials in Defendants' possession while they are otherwise authorized to provide cardiac monitoring services—i.e., during the one-year license period.

Because MedTel's provision of monitoring services for Heartrak ECAT devices unambiguously constitutes using the Heartrak ECAT System within the meaning of ¶ 13 of the Consent Judgment, the Court need not consider extrinsic evidence. *United States v. New Jersey*, 194 F.3d 426, 430 (3d Cir. 1999) (holding in interpreting a consent decree "resort to extrinsic evidence is permissible, but only when the decree itself is ambiguous"). Even if it were necessary to do so, however, the extrinsic evidence reflects that both parties understood the Consent Judgment to prohibit MedTel from providing Heartrak ECAT monitoring services following the expiration of the one-year license period, absent some further agreement between the parties.

At the contempt hearing, Mr. Capper testified the Consent Judgment was intended to give MedTel a "one-year grace period" in which find a "replacement platform" it could use in lieu of the Heartrak ECAT System. Contempt Hr'g Tr. I 57. Upon expiration of the one-year period, however, MedTel would no longer be able "monitor[] patients in the MCT [mobile cardiac telemetry] business unless [it] ha[d] a replacement system or . . . [could] negotiate some sort of an extension with [CardioNet]." *Id.*

Mr. Sanders professed to have a different understanding, stating he interpreted the Consent Judgment to require MedTel to stop distributing ECAT devices, which amounted to selling the Heartrak ECAT System, but to permit MedTel to continue providing monitoring

---

As discussed in greater detail below and in the Court's October 2, 2015, Order, moreover, upon expiration of the one-year license period, ¶ 16 of the Consent Judgment requires MedTel to deliver to CardioNet "all inventories of the Heartrak ECAT System in the United States belonging to or held by Medtel24," including, specifically, the CardioStation software. By specifying that MedTel must relinquish the CardioStation software necessary for MedTel to conduct its conventional activities as a cardiac monitoring service provider, ¶ 16 makes clear that MedTel can no longer provide Heartrak ECAT cardiac monitoring services after the one-year license period.

services for devices it had previously sold.[21]  *See* Contempt Hr'g Tr. I 180-81, 235-36, 255, 257. According to Mr. Sanders, since MedTel did not own those devices, constituting two out of the three parts of the Heartrak ECAT System, it could not be using the System by providing monitoring services.  *See id.* at 180-81, 255, 257.  This testimony, however, is not credible as it is directly contradicted by Mr. Sanders's own emails to Mr. Capper in the weeks just prior to the expiration of the one-year license period.

In a December 8, 2014, email to Mr. Capper, for example, Mr. Sanders requested a 120-day extension of the license period so as "to allow the doctors and Medtel24 until June 1, 2015, to continue to use said [ECAT] devices *as we presently are doing*."  Pls.' Hr'g Ex. PX-7 (emphasis added).  At the time Mr. Sanders sent the December 8, 2014, email, MedTel had already stopped selling Heartrak ECAT devices, *see* Sanders Aff. ¶ 2, ECF No. 307 (stating "Medtel sold its last Heartrak ECAT Monitor on October 31, 2014"); Pls.' Hr'g Ex. PX-7 ("Medtel24, as such, does not presently own any devices."), and was seeking an extension so that MedTel and its customers could continue to use devices MedTel had previously sold, for which MedTel was providing monitoring services, *see* Contempt Hr'g Tr. I 142.  The email thus implicitly acknowledges both that MedTel was using the previously sold devices to provide

---

[21] Mr. Sanders also testified he understood the Consent Judgment to impact MedTel's business by preventing the company from becoming an IDTF because, under that business model, MedTel would provide all the services necessary for a patient to complete a monitoring session and would therefore be using all three parts of the Heartrak ECAT System.  *See* Contempt Hr'g Tr. I 180-81, 236.  Although Mr. Sanders claimed it was part of MedTel's business plan to become an IDTF "someday down the road," *id.* at 236, the business plan MedTel introduced at the contempt hearing identified the fact MedTel was *not* an IDTF as a source of the company's competitive advantage as its physician purchase model offered physicians greater financial benefit from monitoring over the IDTF model, *see* MedTel's Hr'g Ex. DX-1, at 5, 7; *accord* MedTel's Hr'g Ex. DX-3 (MedTel marketing materials touting the increased compensation to physicians under MedTel's model as opposed to the IDTF model).  Indeed, Mr. Sanders characterized MedTel's business model as providing an opportunity to "realign a lot of that [monitoring] income back to the physicians, where it rightfully belongs."  Contempt Hr'g Tr. I 219.

monitoring services and that it knew could not continue to do so after the expiration of the one-year license period unless it obtained an extension from CardioNet.

Approximately six weeks later, on January 20, 2015, Mr. Sanders made a further request for a 120-day extension, explaining that, as he had told Mr. Capper around the time the Consent Judgment was entered, MedTel "could not be possibly ready to develop a new product within the one year that Cardionet was offering," and one year was "not enough time to complete the transfer of the many accounts to new technology." Pls.' Hr'g Ex. PX-10, at 1-2. Contrary to Mr. Sanders's self-serving hearing testimony that he understood the Consent Judgment to permit MedTel to continue providing monitoring services for previously sold devices, the email establishes just the opposite—that MedTel knew it would have to transfer its ECAT customers to "new technology" in order to continue monitoring after the license period.

When asked about the emails at the contempt hearing, Mr. Sanders stated he wanted an extension so as to be able to sell more ECAT devices. *See* Contempt Hr'g Tr. I 180-81, 275-76. The emails, however, make no reference to sales. To the contrary, the December 8, 2014, email characterizes the expiration of the license period as the "deadline for the *use* of ECAT devices" and states the purpose of the extension is to permit the continued use of previously sold ECAT devices. Pls.' Hr'g Ex. PX-7 (emphasis added); *see also id.* (stating an extension "will accommodate the current physicians," i.e., physicians already receiving monitoring services from MedTel).

In addition to arguing the provision of monitoring services for ECAT devices does not constitute infringement of the Patents in Suit based on the plain language of the Consent Judgment, MedTel also raises patent law defenses to the asserted ¶ 14 violation based on patent exhaustion and divided infringement. Neither has merit.

19

Under the doctrine of patent exhaustion, "the initial authorized sale of a patented item terminates all patent rights to that item," where the sale was authorized by the patent holder. *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 625, 636 (2008).  MedTel argues patent exhaustion "prevents Plaintiffs from reaching the third party authorized doctor purchasers who use their Monitors and Communicators" because CardioNet allegedly authorized MedTel's sales of the devices to the doctors either under the License Agreement, which CardioNet assumed following its acquisition of Mednet/UMI, or under the Consent Judgment, which permitted MedTel to continue to sell the devices during the one-year license period.  *See* MedTel's Opp'n to Mot. for Contempt 6-7.  As CardioNet notes, however, it is not seeking to enforce the Consent Judgment against any third party doctors, but only against MedTel.  Insofar as MedTel contends CardioNet's alleged authorization of the sale of two of the components of the System precludes CardioNet from asserting its patent rights against MedTel, MedTel gave up this defense by entering into the Consent Judgment and agreeing, in ¶ 13, that using the Heartrak ECAT System—including, specifically, the components that are now the subject of its exhaustion defense—infringes the Patents in Suit.  Paragraph 13 resolves the issue of what constitutes infringement of the Patents in Suit; the Consent Judgment therefore adjudicates this issue with finality.  *See* Consent J. ¶ 17 (providing "the issues of patent validity, infringement and enforceability resolved in this Consent Judgment are adjudicated with finality").  Under the Consent Judgment, whether MedTel's continued provision of monitoring services for Heartrak ECAT devices infringes the Patents in Suit turns solely on whether MedTel uses the Heartrak ECAT System in providing such services, a question this Court has answered in the affirmative. The defense of patent exhaustion is therefore inapplicable.

MedTel's divided infringement defense fails for similar reasons.  MedTel raised the issue of divided infringement in a notice of supplemental authority filed in July 2015, in which it alerted the Court, without elaboration, to the Federal Circuit's May 2015 decision in *Akamai Technologies, Inc. v. Limelight Networks, Inc.*, 786 F.3d 899 (Fed. Cir. 2015).  In August 2015, the Federal Circuit granted rehearing en banc in the *Akamai* case, vacated the panel opinion, and issued an en banc opinion in its place.  In the en banc opinion, the Federal Circuit took the opportunity to "unanimously set forth the law of divided infringement under 35 U.S.C. § 271(a)."  *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022 (Fed. Cir. 2015) (en banc).  The court reaffirmed that direct infringement of a method patent occurs "where all steps of the claimed method are performed or attributable to a single entity" and held method steps performed by others may be attributable to an entity "in two sets of circumstances:  (1) where that entity directs or controls others' performance, and (2) where the actors form a joint enterprise."  *Id.*  As to the former method of attribution, the court clarified an entity will be liable for infringement "if it acts through an agent (applying traditional agency principles) or contracts with another to perform one or more steps of a claimed method," or if the entity "conditions participation in an activity or receipt of a benefit upon performance of a step or steps of a patented method and establishes the manner or timing of that performance."  *Id.* at 1023. MedTel argues that, under *Akamai*, it cannot be infringing CardioNet's patents because the Patents in Suit are method patents and any infringement is divided between MedTel and the third-party physicians who own and use the Monitors and Communicators.

MedTel's *Akamai* defense calls for an analysis of how and by whom the steps of individual method claims in the Patents in Suit are performed.  In this Court's view, the Consent Judgment forecloses this analysis in relation to the Heartrak ECAT System.  As set forth above,

the Consent Judgment adjudicates with finality that using the Heartrak ECAT System infringes the Patents in Suit.  *See* Consent J. ¶¶ 13, 17.  The infringement question, for purposes of this contempt proceeding, is therefore limited to whether MedTel's provision of monitoring services for Heartrak ECAT devices constitutes using the System, a question that MedTel contends turns on the plain language of the Consent Judgment.  *See* Contempt Hr'g Tr. II 106.  Having agreed that using the Heartrak ECAT System infringes the Patents in Suit, MedTel cannot now ask the Court to go behind the definition of infringement in the Consent Judgment.  *Cf. United States v. Armour & Co.*, 402 U.S. 673, 681-82 (1971) (explaining a consent decree embodies a compromise in which "the parties each give up something they might have won had they proceeded with the litigation" and must therefore be "construed as it is written, and not as it might have been written" had one of the parties prevailed).

As set forth above, the Court finds CardioNet has satisfied its burden to prove by clear and convincing evidence that MedTel has used the Heartrak ECAT System by continuing to provide monitoring services for Heartrak ECAT devices using the CardioStation software. Accordingly, the Court finds MedTel has violated ¶ 14 of the Consent Judgment.

## 2.    **Paragraph 16 Violation**

Paragraph 16 of the Consent Judgment grants MedTel and the other customer Defendants "a limited, non-exclusive license to make, use, sell or offer for sale, the Heartrak ECAT System in the United States for a period one (1) year from the date of this Consent Judgment," but provides

> [t]hereafter, all inventories of the Heartrak ECAT System in the United States belonging to or held by Medtel24, . . . *including all related software/source code, including CardioStation and eCardioStation,* hardware, including the Heartrak ECAT Monitor and Communicator, and documentation shall be delivered, at Medtel24's . . . expense[], to Plaintiffs . . . to be received by Plaintiffs no later than 15 days after the one year date.

Consent J. ¶ 16 (emphasis added).  As the Consent Judgment was entered on January 31, 2014, the "one year date" of the Judgment was January 31, 2015, and MedTel was therefore required to deliver the materials specified in ¶ 16 for receipt by CardioNet no later than February 15, 2015. Based on undisputed evidence that MedTel continued to possess multiple copies of the CardioStation software at the time of the contempt hearing, on October 2, 2015, this Court issued an Order finding MedTel in contempt of ¶ 16 of the Consent Judgment, rejecting MedTel's argument that it was not required to deliver the software to CardioNet because it did not hold the software for sale to customers and thus had no "inventories" of the software.

Apart from its "inventory" argument, which this Court has already rejected for the reasons set forth in the October 2, 2015, Order, MedTel maintains ¶ 16 cannot be understood to require it to give up the CardioStation software because the software has noninfringing applications in connection with the Heartrak Smart Wireless device.  MedTel argues that if interpreted in the manner advocated by CardioNet, the Consent Judgment would effect an antitrust violation and amount to patent misuse.  The doctrine of patent misuse provides a defense to patent infringement when the patentee has used restrictive conditions on licenses or sales to broaden "the physical or temporal scope of the patent grant with anticompetitive effect." *Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1328 (Fed. Cir. 2010) (en banc) (citation and internal quotation marks omitted).  The doctrine applies where, for example, the patentee "requir[es] the purchase of an unpatented product as a condition for obtaining a license to the patent" and thereby "uses [the] patent to obtain protection from competition in the sale of unpatented materials," or where a license "requir[es] the payment of licensing fees after the expiration of the licensed patent and thus ha[s] the effect of extending the patent beyond the statutory period." *Id.* at 1327.  While patent misuse may not be limited to these circumstances,

MedTel cites no authority suggesting the doctrine applies where, in settling an infringement action, a party agrees to relinquish all of the component parts of the infringing system, including a component with noninfringing uses.  The Court thus finds no basis to apply the doctrine of patent misuse here.

For this reason, in addition to the reasons set forth in the October 2, 2015, Order, the Court reaffirms its earlier finding that MedTel has violated ¶ 16 of the Consent Judgment.

### 3.   Paragraph 19 Violation

Paragraph 19 of the Consent Judgment provides:

> None of the Defendants shall transfer, assign, sell or otherwise disclose or make available to any third party any inventory or materials belonging to or held by them relating to the Heartrak ECAT System, including all related software/source code, CardioStation, eCardioStation, hardware, including the Heartrak ECAT Monitor and Communicator, and documentation, outside the scope of their conventional activities as cardiac monitoring service providers, without obtaining prior written permission from CardioNet and Braemar.

Consent J. ¶ 19.  CardioNet argues MedTel violated this provision by giving the Israeli company MedTel hired to advise it on how to build its own software access to the CardioStation software and source code on MedTel's system.

MedTel does not dispute that the CardioStation software and at least some of the source code for the software were disclosed or made available to the Israeli company in connection with its work for MedTel.[22]  In addition, MedTel admits it did not obtain prior written permission from CardioNet before making these disclosures.  Contempt Hr'g Tr. II 91.  MedTel argues, however, its disclosures to the Israeli company do not violate ¶ 19 of the Consent Judgment

---

[22] Tamir Alima, MedTel's Chief Technology Officer, testified MedTel "provided access to the Cardiostation software" to the Israeli company, which also "review[ed] Cardiostation source code."  Alima Dep. 116-17.  Mr. Sanders confirmed the Israeli company reviewed at least some source code for the software, noting the company had informed MedTel the source code was "totally incomplete and jumbled."  Contempt Hr'g Tr. I 302.

because (1) the Israeli company is not a "third party" for purposes of the Consent Judgment and (2) MedTel did not make the software and source code available to the Israeli company outside the scope of its conventional activities as a cardiac monitoring services provider.

Taking the latter argument first, the Court disagrees that MedTel's disclosures to the Israeli company were made within the scope of its conventional activities as a monitoring service provider.  In providing monitoring services, MedTel receives patient cardiac data collected by a Heartrak ECAT Monitor, processes and analyzes the data using the CardioStation software, and provides a report to the patient's physician.  Paragraph 19 thus allows MedTel to disclose Heartrak ECAT System-related materials to third parties as necessary to support these activities. According to Mr. Alima, however, the Israeli company was hired not to support MedTel's ordinary monitoring services but to find an alternative to the CardioStation software.  *See* Alima Dep. 114-17.  Mr. Sanders confirmed the Israeli company was retained to advise MedTel "on how to build our own software, build our own potential hardware and/or seek out other options globally that we could have a better software than what we had with [CardioStation]."  Contempt Hr'g Tr. I 271.  While Mr. Sanders testified the Israeli company also provided "generic support and maintenance activities" for MedTel, which was not "getting a whole lot of support from . . . Mednet's engineers" at the time, *id.* at 272, the record is clear that the company was provided access to the CardioStation software and source code at least in part to help MedTel develop new or different software, an activity outside the scope of its conventional activities as a cardiac monitoring service provider.

Whether the Israeli company is a "third party" for purposes of the Consent Judgment is a closer question.  In arguing the company is not a third party, MedTel relies on ¶ 14(b), which provides that, as used in the Consent Judgment,

25

> "MedTel24" refers to MedTel24, Inc.; its officers; its directors; its shareholders; *its agents*; its servants; its employees; its attorneys; all parent, subsidiary and affiliate corporations or other business entities; *all other persons acting in concert, participation or privity with any of the above*, including indemnitors; and any predecessors, successors, assigns and heirs of any of the above.

Consent J. ¶ 14(b) (emphasis added). MedTel argues because the Israeli company was MedTel's agent, and was acting "in concert, participation or privity" with MedTel, the company was part of "MedTel24" under ¶ 14(b) of the Consent Judgment and thus could not have been a third party for purposes of ¶ 19.

MedTel's interpretation of the term "third party" as excluding persons and entities encompassed within the definitions of the Defendant entities in ¶ 14 is plausible, and insofar as CardioNet advocates a different interpretation, the Court must resolve this ambiguity in favor of MedTel. *See Robin Woods Inc.*, 28 F.3d at 399 (noting the "longstanding salutary rule in contempt cases that ambiguities and omissions in orders redound to the benefit of the person charged with contempt" (citation and internal quotation marks omitted)); *accord John T. ex rel. Paul T.*, 318 F.3d at 552. Whether MedTel violated ¶ 19 by disclosing the software and source code to the Israeli company thus depends on whether the company comes within the broad definition of "MedTel24" in ¶ 14(b). At the contempt hearing, the Court expressed considerable doubt as to whether the Israeli company was in fact MedTel's agent, a legal term of art that, under Pennsylvania law, requires "[1] the manifestation by the principal that the agent shall act for him, [2] the agent's acceptance of the undertaking and [3] the understanding of the parties that the principal is to be in control of the undertaking." *Basile v. H & R Block, Inc.*, 761 A.2d 1115, 1120 (Pa. 2000) (citations and internal quotation marks omitted); *see also id.* (noting agency "results only if there is an agreement for the creation of a fiduciary relationship with control by the beneficiary" (citation omitted)). The existing record does not permit the Court to

determine whether an agency relationship existed between MedTel and the Israeli company. Regardless of whether the company is part of MedTel by virtue of an agency relationship, the definition in ¶ 14(b) also encompasses "all other persons acting in concert, participation or privity with" MedTel and its officers and employees.  Because the Israeli company arguably falls within this broad language, and mindful that contempt is inappropriate "where there is ground to doubt the wrongfulness of the conduct" at issue, *Robin Woods Inc.*, 28 F.3d at 399 (citation omitted), the Court declines to find MedTel in contempt of ¶ 19 of the Consent Judgment.

      **B.**    <u>**Contempt Remedies**</u>

Upon finding MedTel in contempt of ¶ 16 of the Consent Judgment in the October 2, 2015, Order, this Court directed MedTel to comply with its obligations under that provision within 21 days, and directed Mr. Sanders to submit a sworn declaration of compliance within the same 21-day period.  The Court also provided for the imposition of a coercive sanction of $10,000 per day on MedTel and Mr. Sanders for each day they remained out of compliance beyond the 21-day period.  In addition to seeking compliance with the Consent Judgment and coercive sanctions, CardioNet also seeks damages for MedTel's violations of ¶¶ 14 and 16 of the Consent Judgment.  Having previously reserved ruling on CardioNet's request for damages, the Court addresses that issue herein.

Damages are available in civil contempt proceedings "to compensate for losses sustained by the [contemnor's] disobedience."  *Robin Woods Inc.*, 28 F.3d at 400.  A compensatory award seeks "to make reparation to the injured party and restore the parties to the position they would have held had the injunction been obeyed."  *Id.* (citation omitted).  Contempt damages "must not exceed the actual damages caused the offended party by a violation of the court's order." *Quinter v. Volkswagen of Am.*, 676 F.2d 969, 975 (3d Cir. 1982).  Such damages may include an

award of attorneys' fees incurred in connection with the contempt proceedings, as "[o]nly with an award of attorneys' fees can [the injured party] be restored to the position it would have occupied had [the contemnor] complied with the [court order in question]."  *Robin Woods Inc.*, 28 F.3d at 400; *see also Quinter*, 676 F.2d at 975 (noting the relief granted in civil contempt proceedings "usually takes the form of a fine in the amount of the damages sustained by petitioner and an award of costs and attorney's fees").

Although contempt must be established by clear and convincing evidence, the applicable burden of proof for contempt damages is not settled in the Third Circuit.  *See Synthes Spine Co. v. Walden*, No. 03-4140, 2006 WL 3053317, at *12 (E.D. Pa. Oct. 23, 2006).  The Third Circuit Court of Appeals has not squarely addressed the issue.[23]  While several district courts within the Third Circuit have held damages for civil contempt, like liability, must be proved by clear and convincing evidence, *see, e.g.*, *Nelson Tool & Mach. Co. v. Wonderland Originals, Ltd.*, 491 F. Supp. 268, 269 (E.D. Pa. 1980); *Thompson v. Johnson*, 410 F. Supp. 633, 643 (E.D. Pa. 1976),[24]

---

[23] As the Eleventh Circuit noted in surveying the law on this issue, a concurring and dissenting opinion in one Third Circuit case presumes contempt damages must be proved by clear and convincing evidence.  *See McGregor v. Chierico*, 206 F.3d 1378, 1387 (11th Cir. 2000) (citing a comment in Judge Becker's concurring and dissenting opinion in *Gregory v. Depte*, 896 F.2d 31, 40 (3d Cir. 1990), that "civil contempt awards . . . must be vacated if they appear to us excessive, *or unsupported by clear and convincing evidence*" (emphasis added)).  The issue in *Gregory*, however, was whether a monetary contempt sanction imposed by the district court was civil or criminal in nature in light of the lack of *any* evidentiary basis for the amount of the sanction.

[24] In support of this conclusion, the *Thompson* court cited *Yanish v. Barber*, 232 F.2d 939, 946 (9th Cir. 1956), but the *Yanish* court nowhere mentioned the clear and convincing evidence standard, instead holding damages for civil contempt may be denied absent a "substantial showing of damage to [the movant]."  Moreover, as recently as 2013, the Ninth Circuit regarded the burden of proof for contempt damages as an open question.  *See Ahearn v. Int'l Longshore & Warehouse Union, Locals 21 & 4*, 721 F.3d 1122, 1129 & n.3 (9th Cir. 2013) (declining to resolve whether the applicable standard is clear and convincing evidence or a preponderance of the evidence, but noting "[e]very circuit to have considered this issue has adopted a preponderance standard").

other district courts have recognized the weight of authority holds otherwise, *see Synthes*, 2006 WL 3053317, at *12 (observing "most circuit courts addressing this issue have concluded that [civil contempt] damages must be proven by a preponderance of the evidence"); *GE Harris Ry. Elecs., L.L.C. v. Westinghouse Air Brake Co.*, No. 99-070, 2004 WL 1854198, at *12 (D. Del. Aug. 18, 2004).   As the *Synthes* court noted, those federal Courts of Appeals that have considered the issue have uniformly held contempt damages need only be established by a preponderance of the evidence.   *See McGregor v. Chierico*, 206 F.3d 1378, 1387 (11th Cir. 2000) (reasoning that "[s]ince [the court] has already found by clear and convincing evidence that harm has occurred, the damages issue should be treated no differently than any other run-of-the-mill civil action" (alterations in original) (citation omitted)); *Reliance Ins. Co. v. Mast Constr. Co.*, 159 F.3d 1311, 1318 (10th Cir. 1998); *In re Gen. Motors Corp.*, 110 F.3d 1003, 1018 (4th Cir. 1997); *Graves v. Kemsco Grp., Inc.*, 864 F.2d 754, 755 (Fed. Cir. 1988) (applying Seventh Circuit law).   Absent controlling precedent from the Third Circuit, this Court will follow the weight of federal appellate authority and evaluate CardioNet's claimed damages under the preponderance of the evidence standard.

CardioNet seeks to recover three categories of damages:  (1) lost profits, (2) direct expenses, and (3) attorneys' fees and costs.  *See* Contempt Hr'g Tr. I 65, 80-81.

As to lost profits, CardioNet seeks to recover profits it contends it would have earned had MedTel complied with its obligations under ¶¶ 14 and 16 of the Consent Judgment and ceased providing monitoring services for Heartrak ECAT devices following the expiration of the one-year license period on January 31, 2015.[25]  CardioNet seeks lost profits on every monitoring

---

[25] As ¶ 14 prohibited MedTel from using the Heartrak ECAT System after January 31, 2015, and ¶ 16 required MedTel to deliver all inventories of the System, including the software used for

session MedTel provided during the contempt period, i.e., from February 1, 2015, until MedTel stopped providing monitoring services.

To calculate lost profits, CardioNet first determined the company's lost monitoring revenue during the contempt period by calculating its average revenue per monitoring session during that period and multiplying that figure by the total number of monitoring sessions MedTel completed after January 31, 2015.  *See* Contempt Hr'g Tr. I 65.  CardioNet then reduced the lost monitoring revenue figure to account for the cost of providing monitoring services by multiplying the revenue figure by the company's incremental profit margin.  *See id.*

To calculate its average revenue per monitoring session during the contempt period, CardioNet determined its total MCT revenue for the period from February 1, 2015, through August 31, 2015 ($53,433,095) and divided this figure by the number of monitoring sessions it completed during this period (64,341), resulting in an average revenue figure of $830 per monitoring session.  *See* Pls.' Hr'g Ex. PX-4; Contempt Hr'g Tr. I 68-71.[26]

CardioNet determined the total number of monitoring sessions completed by MedTel during the contempt period by reviewing MedTel's billing records, which reflect that between

---

monitoring Heartrak ECAT devices, to CardioNet to be received no later than February 15, 2015, the calculation of lost profits is essentially the same for MedTel's violation of ¶ 14 and ¶ 16.

[26] As noted, CardioNet offers monitoring services under both the traditional (or IDTF) model and the physician purchase model, though the traditional model accounts for 95% or more of its business.  *See* Contempt Hr'g Tr. I 94-95; Contempt Hr'g Tr. II 10.  CardioNet's MCT revenue figures include revenue earned under both models proportional to CardioNet's business under each model; thus, the average revenue figure of $830 per monitoring session is a blended rate that takes into account all monitoring services provided under both models.  *See* Contempt Hr'g Tr. I 102.

February 1, 2015, and August 15, 2015, MedTel completed a total of 2,658 ECAT monitoring sessions.  *See* Pls.' Hr'g Ex. PX-14.[27]

Finally, CardioNet calculated its profit margin on MCT monitoring by identifying eight categories of costs by which the MCT monitoring revenue figure should be reduced[28] and calculating CardioNet's costs in these categories as a percentage of the company's MCT revenue for the first and second quarters of 2015.  *See* Contempt Hr'g Tr. I 73-74.  By CardioNet's calculation, the monitoring revenue figure should be reduced by 38.24%, resulting in an incremental profit margin of 61.76%.  *See id.* at 74-75; Pls.' Hr'g Ex. PX-2.

Multiplying CardioNet's average revenue per monitoring session ($830) by the total number of monitoring sessions completed by MedTel between February 1, 2015, and August 15, 2015 (2,658) by CardioNet's incremental profit margin (61.76%) yields total lost profits of $1,362,512.06 for this portion of the contempt period.

---

[27] Although the billing records made available to CardioNet in preparation for the contempt hearing only include monitoring sessions completed by MedTel through August 15, 2015, CardioNet seeks to recover lost profits for the entire contempt period, which extends until the date MedTel ceased providing Heartrak ECAT monitoring services.  In the damages calculation presented to the Court at the contempt hearing, CardioNet extrapolates that MedTel would have completed an additional 391 monitoring sessions between August 16 and August 31, 2015, for a total of 3,049 monitoring sessions for the period from February 1, 2015, through August 31, 2015.  The Court finds it unnecessary to rely on extrapolation, since CardioNet will need to obtain information about the number of ECAT monitoring sessions MedTel provided during the balance of the contempt period in any event.

[28] Mr. Capper testified the categories of costs that should be taken into account in determining CardioNet's profit margin include certain costs associated with providing monitoring service— i.e., costs associated with patient services, monitoring services, inventory control/logistics, manufacturing, and quality assurance—as well as costs associated with reimbursement services, customer care, and provision for bad debt.  *See* Contempt Hr'g Tr. I 73-74.  In the first two quarters of 2015, these costs accounted for $17,408,179, or 38.24%, of CardioNet's $45,527,767 in monitoring revenue.  *See* Pls.' Hr'g Ex. PX-2.

MedTel takes issue with CardioNet's lost profits calculation, arguing CardioNet has failed to satisfy its burden to prove MedTel's violations of the Consent Judgment caused CardioNet's claimed losses.  Specifically, MedTel argues CardioNet has not shown that, had MedTel complied with the Consent Judgment, (1) CardioNet would have converted 100% of MedTel's customers to CardioNet's monitoring services, and (2) most of the converted customers would have switched to the traditional model, as CardioNet's lost profits calculation assumes.  MedTel focuses in particular on the lack of any evidence from actual MedTel customers who would be willing to switch to CardioNet, noting customers could negotiate with other players in the market.

The Court agrees with MedTel that the evidence falls short of establishing CardioNet would more likely than not have realized its proffered 100% conversion rate.  At the contempt hearing, Mr. Capper testified CardioNet had the capacity to serve all of MedTel's customers during the contempt period and stated that, in his view, it was "highly likely" CardioNet would have converted most, if not all, of these customers to "a CardioNet offering" because CardioNet is "the only company that actually could give them some continuity in terms of what they're used to, what the reports that they're used to looking at, the systems that they're used to using, the device that they're used to using."  Contempt Hr'g Tr. I 66-67, 69-70.  Mr. Capper also testified, however, that CardioNet's market share of the telemetry market is approximately 50%, Contempt Hr'g Tr. II 7-8, with MedTel and an unspecified number of other companies making up the remaining 50%.  Although the Court credits Mr. Capper's unrebutted testimony that CardioNet could provide MedTel's customers with services most similar to those they had been receiving from MedTel, the Court is not persuaded this factor alone would have produced a 100% conversion rate.  Rather, the Court finds this factor would have been a source of advantage

for CardioNet in the telemetry market.  Given this advantage, the Court finds it is more likely than not that CardioNet would have converted MedTel's customers at least in proportion to its 50% market share.

The Court also finds CardioNet has shown by a preponderance of the evidence that most of the converted customers would have switched to the traditional model, as CardioNet's lost profits calculation assumes.  At the contempt hearing, both Mr. Sanders and Mr. Capper explained that the physician purchase model arose in recent years in response to a change in Medicare regulations.  *See* Contempt Hr'g Tr. I 220; Contempt Hr'g Tr. II 6.  Although the physician purchase model offers the possibility of greater monitoring revenue for physicians, Mr. Capper testified the model also has a number of disadvantages, including the outlay of capital a physician must make to purchase the devices and the various risks the physician must assume under the model, such as the risk of maintenance and loss of the devices and the risks associated with negotiating with, billing, and collecting from insurance companies.  *See* Contempt Hr'g Tr. II 9-10.  While CardioNet offers both the traditional and the physician purchase model to customers, most of its business (and most of the market) operates under the traditional model. *See id.* at 5, 7, 10.  Indeed, Mr. Capper stated demand for the physician purchase model appears to be waning and most of CardioNet's own physician purchase model business "is now flipping back to the traditional model." *Id.* at 10-11.  Mr. Capper acknowledged CardioNet was offering several options to customers who want to convert, including, in some cases, temporary pricing at $349 per monitoring session under the physician purchase model.  *Id.* at 22-23.  Given all of the foregoing considerations, however, he opined that most of the customers converting to CardioNet would opt for the traditional model.  *See* Contempt Hr'g Tr. I 98; *see also* Contempt Hr'g Tr. II 12 (opining MedTel's customers would have opted to switch from the physician

purchase model to the traditional model "[f]or the same reason that everybody else is switching back[:] [t]hey're not—just not making money"). The Court finds Mr. Capper's testimony credible on these points and therefore finds it is more likely than not that most of the converted MedTel customers would have chosen the traditional model.

Mindful that damages need be proved only "to a reasonable degree of certainty," and not with "absolute precision," *Berg Chilling Sys., Inc. v. Hull Corp.*, 369 F.3d 745, 764 (3d Cir. 2004) (internal citations omitted), the Court will award CardioNet lost profits on 50% of the ECAT monitoring sessions completed by MedTel during the contempt period.[29] For the period from February 1, 2105, to August 15, 2015, CardioNet will be awarded $681,256.03 in lost profits ($830 average revenue per monitoring session x 1,329 monitoring sessions x 61.76%

---

[29] In arguing the Court should deny CardioNet's claim for lost profits, MedTel urges the Court to follow *Synthes Spine Co. v. Walden*, in which another court in this district denied a plaintiff's request for lost profits upon finding the plaintiff had failed to prove causation. The plaintiff in *Synthes*, a medical device company, sought to recover profits it allegedly lost as a result of its former sales consultants' competitive activities on behalf of another company in violation of a court order. Although the plaintiff presented a damages expert, the expert offered no evidence of causation but simply assumed 100% of the plaintiff's business losses and 100% of the competitor's profits during the restricted period were the result of the defendants' competitive activities, despite evidence that the plaintiff's sales had decreased significantly even before the restricted period. 2006 WL 3053317, at *16. The plaintiff also failed to produce any other evidence suggesting the defendants' contemptuous conduct resulted in the specific losses identified by its damages expert. *See id.* In the absence of evidence establishing a causal link between the defendants' violations of the court order and the expert's damages calculation—and absent any alternative "methodology and record by which the Court could calculate, with some reasonable or equitable degree of precision, that portion of [plaintiff's] losses or [competitor's] profits attributable to contempt defendants' behavior"—the court held the plaintiff had failed to satisfy its burden of proof on causation. *Id.* at *16-17.

This case is distinguishable from *Synthes* in two important respects. First, while CardioNet's damages model, like that of the *Synthes* plaintiff, is premised on a 100% correspondence between MedTel's contemptuous conduct and CardioNet's lost profits, CardioNet has provided evidentiary support for its damages calculation through the testimony of Mr. Capper. Second, unlike in *Synthes*, the record in this case is not devoid of evidence to support an award of lost profits short of the 100% mark. Rather, the evidence of CardioNet's share of the telemetry market provides a reasonable basis for this Court to calculate CardioNet's lost profits attributable to MedTel's violations of the Consent Judgment.

incremental profit margin).  CardioNet is also entitled to damages for lost profits for the period from August 16, 2015, until MedTel ceased providing ECAT monitoring services, in an amount to be determined based on the same methodology upon submission of information concerning the number of ECAT monitoring sessions completed by MedTel during this period.  MedTel shall have 14 days from the date of this Memorandum to produce to CardioNet invoices showing the number of ECAT monitoring sessions it completed from August 16, 2015, until it ceased providing ECAT monitoring services.  The parties shall then have 14 days to submit to the Court a joint stipulation reflecting the number of ECAT monitoring sessions MedTel completed during this period so that the Court may calculate CardioNet's lost profits damages for the balance of the contempt period.

The second category of damages CardioNet seeks consists of certain direct expenses CardioNet paid on MedTel's behalf during the contempt period in its capacity as UMI's successor under the License Agreement.  These expenses consist principally of amounts CardioNet paid for the AT&T wireless accounts associated with the Heartrak ECAT devices for which MedTel provided monitoring services.  Although CardioNet/UMI billed MedTel for these charges, MedTel refused to pay, having notified CardioNet in February 2015 that it was suspending performance of any payment obligations under the License Agreement pending resolution of the arbitration it had commenced against CardioNet the previous month.  *See* Pls.' Hr'g Ex. PX-13; Contempt Hr'g Tr. I 163-65.  Despite MedTel's notification, CardioNet kept the wireless accounts open to allow the Court an opportunity to rule on MedTel's motion to set aside the Consent Judgment.  *See* Contempt Hr'g Tr. I 79-80.  CardioNet eventually shut down the phone lines after this Court denied MedTel's motion in July 2015.  *See id.* at 80.  CardioNet argues these expenses are properly recoverable as contempt damages because it would not have

incurred the expenses if MedTel had ceased providing Heartrak ECAT monitoring services in accordance with the deadline in the Consent Judgment.

MedTel objects to this category of damages on the basis that the propriety of the wireless charges is a subject of the pending arbitration and should be adjudicated in that forum. In the arbitration, MedTel alleges CardioNet breached the License Agreement by failing to transfer to MedTel the phone numbers associated with devices sold by MedTel, as requested in February 2014. MedTel argues that had the phone numbers been transferred, it could have obtained wireless service at substantially lower rates than those charged by CardioNet. MedTel seeks to recover amounts it allegedly overpaid CardioNet for the wireless accounts for the period from February 2014 through July 2014.[30]  *See* MedTel's Supplemental Statement of Claims & Relief Requested 5-6.

The Court agrees with MedTel that CardioNet's claim for unpaid invoices is best resolved in the arbitration. As MedTel notes, the propriety of the expenses CardioNet incurred to maintain the wireless accounts is directly at issue in the arbitration. If CardioNet had no obligation to transfer any phone numbers to MedTel, then CardioNet may be entitled to recover in full the cost of the wireless accounts during the contempt period. But if MedTel prevails on this claim, it may be entitled to a setoff in the amount CardioNet allegedly overcharged it. At the arbitration hearing, CardioNet conceded it would submit this claim for arbitration insofar as the claim concerns expenses incurred prior to February 1, 2015, but took the position the post-January 2015 expenses are properly the subject of this contempt proceeding. *See* Contempt Hr'g Tr. I 76-77. Because CardioNet's entitlement to damages depends in part on the arbitrators'

---

[30] Based on the invoices produced by CardioNet, it appears MedTel stopped paying CardioNet/UMI's invoices after July 2014. *See, e.g.*, Pls.' Hr'g Ex. PX-12, at 5 (unpaid invoice for telecom charges from 8-15-14 through 9-14-14).

ruling, the Court sees no reason why this claim should not be submitted to arbitration in its entirety.

Finally, CardioNet seeks to recover attorneys' fees and costs. CardioNet is unquestionably entitled to recover the fees incurred in prosecuting the instant contempt motion. As the Third Circuit has recognized, "the cost of bringing the violation to the attention of the court is part of the damages suffered by the prevailing party and those costs would reduce any benefits gained by the prevailing party from the court's violated order." *Robin Woods Inc.*, 28 F.3d at 400 (quoting *Cook v. Ochsner Found. Hosp.*, 559 F.2d 270, 272 (5th Cir. 1977)). Indeed, as noted, it is "[o]nly with an award of attorneys' fees" that CardioNet can be "restored to the position it would have occupied" had MedTel complied with the Consent Judgment. *Id.*

In addition to seeking fees associated with the proceedings on the contempt motion, CardioNet also asks the Court to award as contempt damages attorneys' fees incurred in litigating MedTel's motion for relief from the Consent Judgment and motion to stay enforcement of the Consent Judgment, and CardioNet's own motions to stay arbitration and for sanctions. CardioNet argues such fees are appropriately considered contempt damages because they reflect costs CardioNet has been forced to expend to enforce the Consent Judgment.

"[A]ttorneys' fee awards are 'remedial and designed to compensate complainants for losses incurred as a result of the contemnor['s] violations.'" *Id.* at 401 (quoting *Roe v. Operation Rescue*, 919 F.2d 857, 869 (3d Cir. 1990)). As such, an award of attorneys' fees in a contempt proceeding, "must not exceed the actual damages caused the offended party by a violation of the court's order." *Quinter*, 676 F.2d at 975. Although the time CardioNet has devoted to litigating MedTel's Rule 60(b) and stay motions is part of CardioNet's effort to enforce the Consent Judgment, these motions do not themselves violate the Consent Judgment, and the fees

associated with those motions thus may not be awarded as contempt damages.  *See Inst. for Motivational Living, Inc. v. Doulos Inst. for Strategic Consulting, Inc.*, 110 F. App'x 283, 289 (3d Cir. 2004) (reversing an award of attorneys' fees as contempt damages based on the district court's failure to determine which fees related specifically to the defendant's contemptuous conduct, as opposed to his other vexatious post-settlement litigation conduct).  The Court will therefore award CardioNet reasonable attorneys' fees and costs associated with the contempt proceedings only in an amount to be determined by the Court following submission of an appropriate fee petition.  CardioNet shall have 14 days from the date of this Memorandum to file a petition for attorneys' fees, and MedTel shall thereafter have 14 days to submit a response to the petition.

## C.    Sanctions

CardioNet also moves for sanctions under Federal Rule of Civil Procedure 11, 28 U.S.C. § 1927, and the Court's inherent power against MedTel and its counsel for making misrepresentations and frivolous arguments in its motions for relief from the Consent Judgment under Federal Rule of Civil Procedure 60(b) and to stay enforcement of the Consent Judgment, both of which this Court denied in July 2015.

Rule 11(b) provides, in relevant part, that

[b]y presenting to the court a pleading, written motion or other paper—whether by signing, filing, submitting, or later advocating it—an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: (1) it is not being presented for any improper purpose . . . ; (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying or reversing existing law or for establishing new law; [and] (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

Fed. R. Civ. P. 11(b).  A court may sanction "any attorney, law firm, or party that violated [Rule 11(b)] or is responsible for the violation," after providing notice and a reasonable opportunity to respond.  Fed. R. Civ. P. 11(c).  In evaluating whether a filing warrants sanctions, a court "must apply an objective standard of reasonableness under the circumstances."  *Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90, 94 (3d Cir. 1988).  "Sanctions are to be applied only in the exceptional circumstance where a claim or motion is patently unmeritorious or frivolous."  *Ario v. Underwriting Members of Syndicate 53 at Lloyds for the 1998 Year of Account*, 618 F.3d 277, 297 (3d Cir. 2010) (citation and internal quotation marks omitted).  Rule 11 "must not be used as an automatic penalty against an attorney or party advocating the losing side of a dispute."  *Id.* (citation omitted).

Section 1927 permits a court to sanction an attorney for "multipl[ying] the proceedings in any case unreasonably and vexatiously" by requiring the attorney "to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  28 U.S.C. § 1927.  To impose sanctions under § 1927, a court must find "an attorney has (1) multiplied proceedings; (2) in an unreasonable and vexatious manner; (3) thereby increasing the cost of the proceedings; and (4) doing so in bad faith or by intentional misconduct."  *In re Schaefer Salt Recovery, Inc.*, 542 F.3d 90, 101 (3d Cir. 2008) (citation omitted).  Sanctions may not be imposed under § 1927 for conduct resulting from "misunderstanding, bad judgment, or well-intentioned zeal."  *Grider v. Keystone Health Plan Cent., Inc.*, 580 F.3d 119, 142 (3d Cir. 2009) (citation omitted).  Rather, a finding of "willful bad faith on the part of the offending lawyer" is required.  *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 278 F.3d 175, 181 (3d Cir. 2002) (citation omitted); *see also Grider*, 580 F.3d at 142 ("[U]nder § 1927, an attorney's conduct must be of an egregious nature, stamped by bad faith that is violative of

recognized standards in the conduct of litigation." (citation and internal quotation marks omitted)).   The party seeking sanctions "must show by clear and convincing evidence that sanctions are warranted."  *Marino v. Usher*, No. 11-6811, 2014 WL 2116114, at *6 (E.D. Pa. May 21, 2014).

CardioNet argues MedTel and its counsel should be sanctioned under Rule 11 for filing the Rule 60(b) motion because the motion was predicated on the misrepresentation that MedTel was not represented by counsel when the Consent Judgment was entered.[31]  CardioNet argues this assertion was demonstrably false because the Consent Judgment was signed by Benjamin Leace, Esq., of the RatnerPrestia firm as MedTel and the other Defendants' counsel of record in this action and because emails exchanged among counsel in the days before the Consent Judgment was entered reflect that MedTel was also actively represented by another attorney, Dirk Thomas, Esq., in the negotiations regarding the Consent Judgment.

MedTel maintained that notwithstanding the evidence cited by CardioNet to the contrary, it was not represented (or not adequately represented) at the time the Consent Judgment entered. As to Mr. Leace, who made an oral motion the week before trial for RatnerPrestia to withdraw as counsel for Defendants due to a conflict of interest, MedTel maintained that after the final pretrial conference at which Mr. Leace moved to withdraw, the firm was no longer actively representing MedTel as it refused to speak with and provided no assistance to MedTel.  While MedTel conceded Mr. Thomas advised MedTel about aspects of the Consent Judgment, it denied

---

[31] As noted, in its Rule 60(b) motion, MedTel argued the Consent Judgment should be set aside because (1) MedTel was not represented by counsel when the Judgment was entered, rendering the Judgment void ab initio, (2) MedTel accepted the Judgment under duress, and (3) joint defense counsel delayed disclosing a conflict of interest stemming from another Defendant's decision to settle the case, preventing MedTel from presenting an effective defense for trial. MedTel's duress argument also relied in part on the company's alleged lack of counsel.

he ever represented the company in this case, instead characterizing him as an advisor who took on a limited role with respect to the Consent Judgment.

In denying MedTel's Rule 60(b) motion, this Court rejected MedTel's position for the reasons set forth in the Court's July 22, 2015, Memorandum.  The Court, however, does not find MedTel's position was so patently unmeritorious or frivolous as to warrant Rule 11 sanctions.

CardioNet also argues sanctions should be imposed on MedTel's counsel under § 1927 and the Court's inherent authority for filing a baseless motion to stay enforcement of the Consent Judgment pending disposition of MedTel's Rule 60(b) motion or the arbitration it commenced under the License Agreement.  CardioNet argues MedTel's contention that the Rule 60(b) motion had a likelihood of success on the merits was baseless in light of evidence to the contrary, its arguments that enforcing the Consent Judgment would harm the public interest were disingenuous, and its argument for a stay pending arbitration was illogical.  While the Court agrees the motion to stay lacked merit, the Court does not find the motion was the product of the kind of willful bad faith necessary to support a sanctions award under § 1927 or the Court's inherent authority.[32]

**CONCLUSION**

For the reasons set forth above, the Court finds MedTel in contempt of ¶ 14 as well as ¶ 16 of the Consent Judgment.  In addition to the relief granted in the Court's October 2, 2015, Order, CardioNet will be awarded (1) lost profit damages in the amount of $681,256.03, plus an

---

[32] Having declined to award sanctions under Rule 11 and 28 U.S.C. § 1927, the Court also declines to impose sanctions pursuant to its Court's inherent authority.  *See Schaefer Salt Recovery*, 542 F.3d at 97 n.3 (noting inherent authority sanctions "[g]enerally . . . should be reserved for those cases in which the conduct of a party or an attorney is egregious and no other basis for sanctions exists," and usually require a finding of bad faith (alteration in original) (citations and internal quotation marks omitted)).

amount to be determined upon the parties' submission of a joint stipulation regarding the number of ECAT monitoring sessions completed by MedTel during the period from August 16, 2015, until MedTel ceased providing ECAT monitoring services, and (2) reasonable attorneys' fees and costs incurred in prosecuting this contempt proceeding in an amount to be determined upon CardioNet's submission of an appropriate fee petition.  CardioNet's motion for sanctions will be denied.  An appropriate Order follows.

BY THE COURT:


   /s/ Juan R. Sánchez
Juan R. Sánchez, J.